UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| AT&T SERVICES, INC. and DIRECTV, LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) Case No. 4:19-CV-01925-NCC ) |
| MAX RETRANS LLC, | ) ) ) |
| Defendant. | ) ) |

# MEMORANDUM AND ORDER

This matter is before the Court on Defendant Max Retrans LLC's ("Max Retrans") Motion to Dismiss (Doc. 22). Plaintiffs AT&T and DIRECTV, LLC (collectively, "AT&T" or "Plaintiffs") filed a response (Doc. 27) and Max Retrans filed a reply (Doc. 30). AT&T also filed a Notice of Supplemental Authority (Doc. 36) and, at the request of the Court, Max Retrans filed a Response to the Notice (Doc. 38). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c) (Doc. 31). For the following reasons, Max Retrans' Motion will be **GRANTED**.

## I. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Federal Rule of Civil Procedure 12(b)(6) provides for a motion to dismiss based on the "failure to state a claim upon which relief can be granted." To survive a motion to dismiss a complaint must show "'that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice" to defeat a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 678. (citation omitted). The pleading standard of Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). All reasonable inferences from the complaint must be drawn in favor of the nonmoving party. *Young v. City of St. Charles, Mo.,* 244 F.3d 623, 627 (8th Cir. 2001).

## II. Background[1]

Local broadcast channels are licensed by the Federal Communications Commission to broadcast their television signals over the air for free (Doc. 6 at ¶¶1, 15). Under the Communications Act of 1934, as amended, multichannel video programming distributors ("MVPDs") such as Plaintiffs must get the consent of the local stations to transmit the local broadcast channels alongside their pay-TV channels (*Id.* at ¶¶1, 16). Consent is obtained through retransmission consent agreements ("RCAs") (*Id.* at ¶1).

---

[1] The facts included in the Background section are taken from Plaintiffs' Complaint (Doc. 6) as well as the underlying nondisclosure agreement, attached as an exhibit to Retrans' memorandum in support of its Motion to Dismiss (Doc. 22-1). While this additional item is a matter outside the pleading, the Court concludes, as the parties concur, that the nondisclosure agreement is a matter embraced by the pleadings and is therefore properly considered on a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss (*See* Doc. 22 at 4; Doc. 27 at 2). *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008) (The Court may consider "some public records, materials that do not contradict the complaint, or materials that are necessarily embraced by the pleadings.") (internal quotation omitted).

2

Defendant Max Retrans represents station groups in their negotiations with MVPDs (*Id.* at ¶3). Duane Lammers ("Lammers") is the principal of Max Retrans (*Id.* at ¶5). In 2016, Lammers negotiated RCAs on behalf of a group of eleven different broadcast station groups (*Id.* at ¶21). On September 13, 2016, in connection with AT&T's agreement to negotiate with Max Retrans, Max Retrans signed a confidentiality agreement (the "NDA") (*Id.* at ¶22). The NDA indicates that Max Retrans "is representing certain station groups" subsequently called the "Represented Station Groups" "for the continued carriage or carriage launch, as applicable, of the broadcast television stations owned and operated by such Represented Station Groups (the "Negotiations")" (Doc. 22-1 at 2) (emphasis excluded). Under the terms of the NDA, Max Retrans agreed "to not disclose to any third party (including any client of MAX RETRANS other than the applicable Represented Station Group engaged in such Negotiations) . . . Confidential Information" (*Id.*). "Confidential Information" includes "any term or provision of any underlying and/or ancillary agreement between the Company(ies) and the Represented Station Group(s) for carriage of station(s) of such Represented Station Group(s)" (*Id.*). "MAX RETRANS may disclose Confidential Information to (i) the Represented Station Group and such other persons that are specifically authorized under the confidentiality provisions of an Agreement" including "such of MAX RETRANS's [sic] employees who have a need to know such information to enable MAX RETRANS to represent Represented Station Group(s) in connection with the Negotiations" (*Id.*). The NDA also indicates that the agreement "shall be governed by and construed in accordance with the laws of the State of California applicable to contracts made and fully performed therein" (Doc. 22-1 at 3).

By their terms, the RCAs negotiated in 2016 expired in late March 2019 (Doc. 6 at ¶24). In January 2019, AT&T initiated negotiations to renew these agreements (*Id.* at ¶25). AT&T

was advised that Max Retrans would represent 10 of the station groups from the 2016 negotiations in the renegotiations (*Id.* at ¶¶5, 25). All 10 station groups are managed and controlled by Sinclair Broadcast Group ("Sinclair") (*Id.* at ¶3). According to Lammers, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (*Id.* at ¶29). Lammers acknowledged and represented that the 2016 NDA remains in effect and applies to the renegotiations (*Id.* at ¶¶5, 25). Lammers ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (*Id.* at ¶25).

In early March 2019, AT&T sent Max Retrans separate individualized proposals for each of the 10 stations groups (*Id.* at ¶26). Later that month, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (*Id.*). ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (*Id.*). AT&T subsequently accepted further extensions of the existing agreements until late-May/early-June 2019 (*Id.*).

On April 1, 2019, Lammers responded on behalf of the "Joint Parties" and provided AT&T with a marked-up version of AT&T's proposal for the ▬▬▬ of the 10 station groups (*Id.* at ¶27). AT&T attempted to negotiate each RCA separately, sending new proposals for each station group ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (*Id.* at ¶28). ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (*Id.* at ¶¶28, 29). In response to Lammers' indications, AT&T and its outside counsel sent Max Retrans letters with information that this conduct and negotiation strategy would violate the NDA (*Id.* at ¶30). ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

███████████████████████████████████

███████ (*Id.* at ¶31).

Shortly thereafter, in June 2019, ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████ (*Id.* at ¶32). Later that same

month, ████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ (*Id.* at ¶33). ████████████████████████

██████████████████████████████ (*Id.*).

On July 11, 2019, Plaintiffs filed this action against Max Retrans for Breach of Contract (Count I) and for violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b) (Count II) (Doc. 6). Plaintiffs generally assert that Max Retrans has breached and will continue to breach the 2016 NDA (*Id.* at ¶6). Specifically, Plaintiffs assert that ████████████

██████████████████████████████████████████████████

████████████████ (*Id.*). Plaintiffs additionally argue that ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████ (*Id.*).

As of the filing of the lawsuit, the RCAs from nine of the ten stations groups have expired without extension (*Id.* at ¶7). Without an RCA or an extension in place, the channels have "gone dark" meaning AT&T subscribers see only a black screen when they select an affected local channel (*Id.*). AT&T seeks damages, including lost subscriber revenue and retransmission consent fees which exceed what those stations would have paid absent the breach, punitive

damages, attorneys' fees, and declaratory and injunctive relief to "prevent further unlawful disclosure of AT&T's confidential information" (*Id.* at ¶8).

On August 5, 2019, Max Retrans filed a Motion to Dismiss Plaintiffs' Complaint for Failure to State a Claim pursuant to Federal Rule of Civil Procedure 12(b)(6). In its Motion to Dismiss, Max Retrans asserts that Max Retrans did not breach the NDA because the station groups were jointly negotiating and thus were not "third parties" with respect to the negotiations at issue here (Doc. 22).

## III. Analysis

### A. Breach of Contract

A federal court exercising its diversity jurisdiction applies the choice of law rules of the state where it sits. *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007). "Under Missouri law, parties may choose the state whose law will govern the interpretation of their contractual rights and duties and this choice will be honored so long as the application of this law is not contrary to a fundamental policy of Missouri." *Selvy v. Sun Life Assurance Co. of Canada*, 310 F. Supp. 3d 1026, 1028 (W.D. Mo. 2018) (quoting *Peoples Bank v. Carter*, 132 S.W.3d 302, 304 (Mo. Ct. App. 2004)) (internal quotation marks omitted). *See also McKeage v. TMBC, LLC*, 847 F.3d 992, 1002 (8th Cir. 2017) ("A valid choice of law provision in a contract binds the parties.") (quoting *State ex rel. McKeage v. Cordonnier*, 357 S.W.3d 597, 600 (Mo. 2012)) (omitted internal quotation marks). The NDA includes a valid choice of law clause indicating that the laws of the State of California apply to the contract (Doc. 22-1). Further, the parties agree that California law applies (Doc. 22 at 10; Doc. 27 at 9 n.1). Therefore, the Court will apply the laws of the State of California.

"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Powerine Oil Co. v. Superior Court*, 37 Cal. 4th 377, 390 (2005). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *Tessera, Inc. v. UTAC (Taiwan) Corp.*, No. 5:10-CV-04435-EJD, 2016 WL 8729937, at *4 (N.D. Cal. Jan. 15, 2016) (quoting *In re Marriage of Lafkas*, 237 Cal. App. 4th 921, 932 (Cal. Ct. App. 2015) (citing Cal. Civ. Code § 1639)) (internal quotations marks omitted). "When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further." *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 766 (2018). The threshold question in a contract dispute, therefore, is whether the writing is ambiguous. *Thompson v. Asimos*, 6 Cal. App. 5th 970, 986 (Cal. Ct. App. 2016). A contract is not ambiguous unless, "after applying established rules of interpretation, [it] remains reasonably susceptible to at least two reasonable but conflicting meanings." *CNH Indus. N.V.*, 138 S. Ct. at 765. Neither "disagreement concerning the meaning of a phrase," nor "the fact that a word or phrase isolated from its context is susceptible of more than one meaning" make a contract ambiguous. *Powerine Oil Co.,* 118 P.3d at 598. Under California law, "[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." *Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60 (Cal. 2006).

Under the clear, unambiguous terms of the NDA, each station group participating in a joint negotiation would not be a "third party" and thus would be entitled to "Confidential Information." Under the terms of the NDA, Max Retrans agreed "to not disclose to **any third party** (including any client of MAX RETRANS other than the applicable Represented Station Group engaged in such Negotiations)" Confidential Information (Doc. 22-1 at 2) (emphasis

7

added). Plaintiffs assert that the "Representative Station Group" in this clause means only the specific Station Group engaged in negotiations because the term is qualified by the word "applicable" and Representative Station Group is singular here as opposed to plural as it is elsewhere in the NDA (Doc. 27 at 1-2). Indeed, elsewhere in the NDA, the NDA indicates that Max Retrans is representing the "Represented Station Groups" or "Represented Station Group(s)" (Doc. 22-1 at 2). However, upon review of the terms in the context of the NDA, this interpretation would render the agreement nonsensical. *Tessera, Inc.*, 2016 WL 8729937, at *4 ("[I]nterpretations that create absurd or unreasonable results must be avoided.") (quoting *Sequeira v. Lincoln Nat'l Life Ins. Co.*, 239 Cal. App. 4th 1438, 1445 (2015)) (internal quotation marks omitted). Station groups negotiating jointly would be unable to share information about the terms or conditions of the negotiations and agreements. Furthermore, a plain reading of the entire contract does not support this interpretation. In fact, the parties use the terms "Represented Station Group," "Represented Station Groups," and "Represented Station Group(s)" interchangeably. For example, Max Retrans is permitted to disclose "Confidential Information" to "employees who have a need to know such information to enable MAX RETRANS to represent Represented Station Group(s) in connection with the Negotiations" (Doc. 22-1 at 1). Additionally, the NDA defines "Negotiations" as negotiations between the Represented Stations Groups, plural, and AT&T (*Id.*). Therefore, the "Represented Station Group" engaged in "Negotiations" are clearly those station groups negotiating independently or those station groups negotiating jointly with other station groups. This reading similarly affords the most common sense meaning to the term "third parties" as clients of Max Retrans not involved in the then-current negotiations would not be privy to "Confidential Information" from the "Negotiations." Therefore, the Court finds that each station group participating in a joint

8

negotiation would not be a "third party" and thus would be entitled to "Confidential Information." Plaintiffs may not create ambiguity by alleging facts outside the four corners of the NDA, and once the Court has determined that the NDA is unambiguous, the Court may not consider external evidence. *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 766 (2018).

Each of the ten station groups at issue here were parties to a single joint negotiation and thus not "third parties" under the NDA. At no point in Plaintiffs' Complaint do Plaintiffs suggest that Lammers was negotiating exclusively on behalf of the ▮ station group or any of the other station groups. Indeed, the Complaint is replete with allegations to the contrary. Plaintiffs specifically indicate that Lammers repeatedly stated that he was negotiating jointly on behalf of all ten station groups. In fact, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Lammers also provided AT&T with a marked-up draft agreement for all the station groups. Even though that agreement related specifically to the ▮ station group, AT&T alleges that ▮▮▮▮▮▮▮▮▮▮▮ Only a day prior to the filing of the current lawsuit, an agreement was reached with the ▮ station. Notably, as alleged by AT&T, the parties have not engaged in separate negotiations with the remaining nine station groups resulting in them "going dark." AT&T also alleges that Lammers explained to AT&T that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ To the extent AT&T repeatedly asserts that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9

▇▇▇▇▇▇▇ Therefore, the Court will grant Defendant's Motion as to Count III and dismiss the claim.

**B. The Defend Trade Secrets Act**

The DTSA creates a private right of action for "[a]no owner of a trade secret that is misappropriated." 18 U.S.C. § 1836(b)(1). "Misappropriation" includes disclosure "without express or implied consent" where the trade secret was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II). As the Court has determined that Max Retrans' disclosure of Confidential Information to the nine ▇▇▇▇▇▇ station groups was not inconsistent with the NDA, Plaintiffs' claim under the DTSA fails as a matter of law. Therefore, the Court will also grant Defendant's Motion as to Count II and dismiss the claim.

### IV. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Max Retrans LLC's Motion to Dismiss (Doc. 22) is **GRANTED** and this matter is **DISMISSED, with prejudice**. A separate order of dismissal will accompany this Order.

Dated this 16th day of January, 2020.

    /s/ Noelle C. Collins
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE